# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00184-CV

**Randall K. Flanary d/b/a Easyliving Homes and Easyliving Homes, Inc.;
and San Angelo Easyliving Homes Inc., Appellants**

**v.**

**Roy Mills d/b/a Roy Mills Construction & Roofing, Appellee**

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT
NO. A-01-0309-C, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING**

## O P I N I O N

Randall K. Flanary, doing business as Easyliving Homes and Easyliving Homes, Inc. ("Flanary")[1], and San Angelo Easyliving Homes Inc. appeal a judgment favoring Roy Mills. After a trial to the court, the district court found that Flanary breached a fiduciary duty and committed fraud. The court awarded Mills $207,467.66 in damages and attorney's fees. Although all appellants joined in the notice of appeal, Flanary alone filed the only brief by an appellant. He complains that the district court failed to file adequate findings of fact and conclusions of law. He also contends that the judgment is erroneous because he had no duty to Mills, and complains that the evidence supporting the damage award was insufficient. We will affirm the judgment.

---

[1] Flanary's wife, Lona, and son, Steve, also play a part in this case. We will refer to Randall K. Flanary as "Flanary," and use the first and last names of the other Flanarys.

# BACKGROUND

Testimony in this case came from Mills, Flanary, Flanary's wife, financial experts, and San Angelo-area homebuilders.

Mills testified that, although Flanary is his uncle (his mother's brother), they grew up like brothers because Flanary is only six or seven years older. Mills testified that they have always been close; he said that he has always trusted and looked up to Flanary. After working in construction for more than a decade, Mills worked for Flanary in his oil-industry business until a fellow employee died on location; Flanary moved Mills into another, safer position to protect him, but Mills felt he was not qualified for the job and relinquished it to someone more qualified who would give his uncle more value for the money.

Mills returned to construction and built a house for Flanary. In 1995, Mills formed Roy Mills Roofing and Construction with Flanary's financial support. Mills said that they agreed to an even split of the company, that they would pay their own expenses, and that profits would stay in the company as capital. There was not a written agreement establishing the partnership. Mills testified that Flanary provided the initial capital, but that the company repaid that money. Flanary and his wife maintained the checkbook for the company.

In 1996, Flanary gave his share of the roofing company to his son, Steve Flanary,[2] and started Easyliving Homes with Mills. Mills said that he contributed $15,000 to Easyliving and that

---

[2] Mills left the roofing company in 1997 after a dispute with Flanary's son, Steve Flanary—a dispute that made Flanary's wife, Lona Flanary, so angry that she reportedly demanded that Flanary stop working with Mills.

Flanary contributed $62,000; Mills brought to the company his lengthy experience in homebuilding. Mills testified that, like the roofing company, he and Flanary had equal ownership and were entitled to an equal share of profit and loss. Mills testified that they agreed to pay their own personal expenses—*e.g.*, cell phone, car payments, gasoline, insurance—to accelerate the capitalization of the company. They began building their first Easyliving home in February 1996. Although the company was not incorporated, its bank accounts were opened in the name of "Easyliving Homes, Inc." Mills's framing company provided framing services for Easyliving. Flanary provided cabinetry services. Both held themselves out as general contractors for Easyliving.

The company was incorporated as San Angelo Easyliving Homes, Inc. in 1996, although Mills testified that it never did business under that name; he said it used Easyliving Homes or Easyliving Homes, Inc. Mills did not see the articles of incorporation until he filed this lawsuit. Mills testified that the incorporation did not change the equal sharing of the business. He testified that, as with the roofing company, he trusted Flanary to handle the company checkbook.

Mills testified that, after their first house netted a profit of $3000, they started building larger houses for bigger profit margins. Mills said that the only representation Flanary made about the business is that it was doing fine—until Mills inquired about withdrawing some of his share of the profits to help build his own house. Flanary then told him that the business had actually been losing money. Flanary asserted that Mills had only contributed $5000 to the company, but later acknowledged that Mills had invested $15,000. Flanary eventually gave Mills a check from Easyliving for $7,254.86 as his share of the proceeds from the four years of the company's existence. Mills said he told Flanary he would need to see the company's books before he would accept that

amount as settling his interest; he said Flanary responded, "You'll never see the books," and drove away. Mills never saw the books, even after suing Flanary and making discovery requests. Flanary supplied some checks and asserted that Mills owed Easyliving various amounts, but Mills testified that Flanary never supplied supporting documentation. Mills testified that he did not use company funds for personal expenses, but that checks drawn on Easyliving's account showed that Flanary had used the company's accounts to pay personal utility bills and income tax and to provide personal loans. Mills testified that he had not heard Flanary say that Mills did not own a share of the company until Flanary's deposition.

Mills testified that he expected Easyliving to make about $20,000 profit per house. He testified that Easyliving's profit margins should have been higher than other builders' margins because he and Flanary were supposedly giving much of their labor to the company. Mills testified that Prestonwood Homes, the construction company he formed in 2000 with his son, had an average profit of $22,000 per house for the six homes they had built. He testified that these houses are comparable to the ones he built for Easyliving, that home prices are about the same, and that he uses many of the same subcontractors as before.

Tony Jones and Rocky Templin own construction companies that build houses in the same general area as Easyliving did. They testified that Mills was an equal partner in Easyliving Homes, although Templin conceded that he did not know the specifics of the corporate form or the shareholders' contributions to the company. Templin testified that neither Mills nor Flanary told him that their Easyliving business had ended before 2000. Templin's goal was a 15 percent profit per house. Jones said he tried to make between ten and fifteen percent profit per home.

4

Lona Flanary testified that the roofing company was an equal partnership between Mills and Flanary from which they agreed to take profits and invest them in the new construction company, leaving the roofing company to Steve Flanary. She testified that Mills and Flanary owned equal shares of the construction company. She said that, after a dispute between Mills and Steve Flanary over the roofing company, she did not want Flanary to be partners with Mills any more. She believed that the relationship terminated, although she never spoke to Mills about business again. She testified that she and her husband did not believe that Mills continued to have any ownership interest in the corporation. No stock certificates were ever issued, nor were any minutes or resolutions kept. The corporation was dissolved effective December 27, 2000.

Lona Flanary testified regarding a large number of checks she had signed on the Easyliving account making loans to Flanary and her, and paying such things as their personal credit card debts, utilities, insurance, income tax, and wages for bookkeeping services. She testified, however, that their accountant sorted out their personal expenses from business expenses, and deducted from their personal capital the amounts spent on personal expenses.

Karen Coates, a certified public accountant and business appraiser, testified that she reviewed many documents to form an opinion about the size of Mills's rightful share of the company's profits. She reviewed Easyliving's bank statements, deposit slips, and check stubs that were provided, the tax returns of the individuals and Easyliving, the general ledgers and financial statements, the articles of incorporation and related documentation, and depositions. She based her calculations regarding personal items on Mills's testimony that he and Flanary had agreed not to take out personal expenditures from the corporation. She examined the checks bearing in mind Flanary's

deposition testimony that, when an expenditure related to a particular house, he wrote the address of the house on the check.

Coates concluded that, between 1996 and 2000, Easyliving Homes realized net cash proceeds of $1.8 million from the sale of houses. She noted that Easyliving's corporate tax return for 2000 was erroneous because the new accountant, Delbert Kleppe, failed to credit Mills with his $15,000 capital contribution ($1000 in stock and a $14,000 loan), crediting that to Flanary instead. She also examined the records of another bank account Flanary opened in December 1999 through which he funneled funds relating to an Easyliving construction job on a street named Avondale. She estimated that Flanary was paid a $25,005 management fee for the Avondale job that never went into Easyliving's account.

When calculating Mills's undistributed share of the profits, Coates started with the corporate income tax returns which Flanary signed. She subtracted the federal income tax, gave credit for nondeductible items that were nevertheless expenses of the corporation, added the Avondale fee, and corrected mistakes regarding characterization of certain payments. This indicated a total income of $59,749 after taxes and not considering wrongly paid personal items. Coates testified that, unlike Mills, Flanary and Lona Flanary took substantial sums from the corporation, including cell phone bills, personal credit card bills, fuel expenses, insurance premiums, loans and fee overpayments for bookkeeping and cabinet-making service, and various other expenses like medical expenses, traffic tickets, hunting and fishing licenses, boat expenses, equipment purchases, vehicle maintenance, and home utilities. These various expenses totaled $252,123. Coates calculated that income for Easyliving during its existence totaled $311,872—the amount she also

6

calculated in exhibit 32 as Easyliving's income. She then subtracted $5000 based on a mischaracterization of loan proceeds she had recently learned about, leaving undistributed income of $306,872. She calculated that Mills's half of the undistributed income was $153,437. She then added $15,000 for the return of Mills's $1000 in stock and $14,000 loan to the company, arriving at her final recommended damage award of $168,437. On cross-examination, Coates admitted she did not know for certain the source of some deposits or the use of some checks, but said that she was confident that she correctly characterized the deposits and expenses based on notations on the checks and other witnesses' testimony.

Flanary testified that the plan from the inception of the roofing business was for him and Mills to earn enough money to start a construction company and to pass the roofing business along to Steve Flanary. Flanary's testimony about the inception of the construction company essentially agreed with Mills's version except that Flanary testified that Mills agreed Flanary would control 51 percent of the company. Flanary also testified that Mills agreed to draft house plans for him in exchange for a drafting table. He later testified that Mills had basically three plans that he would adjust slightly, but that Flanary never asked for the variations and never used them.

Flanary testified that he did not know anything about the division of Easyliving's common stock and said that stock certificates were never issued. He admitted that the corporation had no annual meetings, minutes, or resolutions authorizing him to spend corporate funds other than one authorizing him to sell houses. He also admitted that he would on occasion withdraw cash when making a deposit from a home sale; one particular occasion he took $2500. He testified that he may have used the money to pay down a loan.

7

Flanary testified that, after the dispute betwen Mills and Steve Flanary, Mills agreed to step out of Easyliving because of Lona Flanary's anger. Flanary said Mills understood that Lona Flanary was so angry that she would divorce Flanary if he continued to work with Mills. Thus, Flanary testified, Mills shared only in the proceeds of the first house.

Flanary testified that he bought a truck with funds he invested in the company and reaped a tax deduction because he used it for work purposes; however, he also testified that he felt he had bought the truck himself. He testified that Easyliving built all but two of the houses for which he built cabinets during this period; the funds from the two outside projects went into Easyliving's account. He conceded that he used Easyliving accounts, including letters of credit, to work on his own property, but said he reimbursed those amounts with personal funds. Flanary testified that the uncredited management fee Coates estimated at $25,005 was only a $19,000 fee.

Flanary testified that Mills's deposits to Easyliving's account were not all capital contributions and that Mills's withdrawals were not all for company purposes. Flanary testified that the first $5000 was essentially a way to finance construction at Mills's home; Mills used about $3700 of that amount on the project. Flanary also testified that Mills bought a stove and billed it to the company as a Christmas present.

Kleppe, Easyliving's accountant, testified that he was hired in late 1999 to help ensure that Easyliving's books were in order for the dissolution at the end of 2000. Despite this role, Kleppe did not learn of the second company bank account that Flanary opened until trial. Kleppe disagreed with Coates's characterization of many expenses as personal, opining that they were

8

business expenses under Internal Revenue Service rules. Kleppe calculated that Mills's share of the undistributed profits was $22,204.44.

The court chose to credit Mills's version for the most part, and used Coates's calculations with some adjustments. The court subtracted $6000 from Coates's estimate of the undistributed profits to reflect the actual amount of the $19,000 construction management fee (instead of the $25,005 Coates estimated), leaving an award of $147,437. The court stated on the record that this amount included Mills's $15,000 capital contribution, which further departs from Coates's calculation that added those amounts to the undistributed profit.

Flanary requested findings of fact and conclusions of law, and the court filed some. The court did not separate the findings and conclusions, simply listing five findings and conclusions. Flanary objected to the nature and form of the findings and conclusions, contending that they were only conclusions and lacked supporting findings of fact. He requested amended or additional findings and conclusions, but the court did not file any more findings and conclusions.

## DISCUSSION

Flanary raises procedural and evidentiary issues on appeal. He complains that the district court filed deficient findings of fact and conclusions of law, and then refused his request to amend them. He also asserts that the findings of breach of fiduciary duty and fraud were erroneous because he had no duty to Mills and did not conceal any company records from him. Flanary also contends that the evidence was not factually sufficient to support the damages awarded Mills.

9

**Adequacy of Findings of Fact and Conclusions of Law**

Flanary contends that the district court's findings of fact and conclusions of law were deficient because the court made only conclusions that did not contain the facts on which the court based its judgment. He asserts that the district court's findings "do not identify to whom the fraud was committed, nor do they contain the facts by which the trial court arrived at the damages in the cause." He requests that we abate this proceeding, order additional findings and conclusions, then reverse the cause for a new trial.

Upon a party's timely request for additional findings, the trial court "shall file any additional or amended findings and conclusions that are *appropriate*." Tex. R. Civ. P. 298 (emphasis added). Additional findings are not required if the original findings of fact and conclusions of law "properly and succinctly relate the ultimate findings of fact and law necessary to apprise [the party] of adequate information for the preparation of his or her appeal." *In re Marriage of Morris*, 12 S.W.3d 877, 886 (Tex. App.—Texarkana 2000, no pet.) (quoting *Finch v. Finch*, 825 S.W.2d 218, 221 (Tex. App.—Houston [1st Dist.] 1992, no writ)). In general, the failure to make additional findings of fact and conclusions of law after a timely request requires reversal unless the record affirmatively shows the complaining party has not suffered an injury. *Tillery & Tillery v. Zurich Ins. Co.*, 54 S.W.3d 356, 360 (Tex. App.—Dallas 2001, pet. denied). If the record indicates that a party did not suffer injury, the failure to make additional findings does not require a reversal. *Johnston v. McKinney Am., Inc.*, 9 S.W.3d 271, 277 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). If the refusal to file additional findings does not prevent a party from adequately presenting an argument on appeal, there is no reversible error. *See ASAI v. Vanco Insulation*

*Abatement, Inc.*, 932 S.W.2d 118, 122 (Tex. App.—El Paso 1996, no writ). Furthermore, if the requested findings will not result in a different judgment, those findings need not be made. *Johnston*, 9 S.W.3d at 277.

The trial court need only enter findings, or additional findings, on ultimate or controlling issues, rather than on mere evidentiary issues. *See Lifshutz v. Lifshutz*, 61 S.W.3d 511, 515 (Tex. App.—San Antonio 2001, pet. denied). An ultimate fact issue is one that is essential to the cause of action and would have a direct effect on the judgment. *Clear Lake City Water Auth. v. Winograd*, 695 S.W.2d 632, 639 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). An evidentiary issue is one the trial court may consider in deciding the controlling issue, but is not a controlling issue itself. *See id.*

Although the district court did not differentiate between findings of fact and conclusions of law, some of its statements are by their nature findings on ultimate facts. The court stated in its judgment that Flanary breached a fiduciary duty and committed fraud, and stated in its findings of fact and conclusions of law that he committed fraud. The court found an amount of damages. Whether fraud occurred has long been considered a fact question. *Graham v. Roder*, 5 Tex. 141, 148 (1849). Likewise, the existence of a confidential relationship is a question of fact, *see Crim Truck & Tractor Co. v. Navistar Intern. Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992), as is whether that relationship was breached, *Brewer & Pritchard, P.C. v. Johnson*, 7 S.W.3d 862, 867 (Tex. App.—Houston [1st Dist.] 1999), *aff'd*, 73 S.W.3d 193 (2002). The amount of damages is also an issue of fact. *See Murphy v. Waldrip*, 692 S.W.2d 584, 587 (Tex. App.—Fort Worth 1985, writ ref'd n.r.e.). Thus, the court made findings of fact upon which it based its judgment.

11

The record reveals no error in or harm from the court's failure to make an additional finding or conclusion specifying the party defrauded. The district court found that "[d]efendant Randall K. Flanary d/b/a Easyliving Homes and San Angelo Easyliving Homes, Inc. has committed fraud against plaintiff." In response, Flanary requested an additional finding or conclusion clarifying "whether the fraud found to be committed was against the plaintiff or against San Angelo Easyliving Homes, Inc." But the court found that fraud was committed against "plaintiff," and the record shows that there is only one plaintiff, Roy Mills. Even in the original petition filed by "Roy Mills d/b/a Roy Mills Construction and Roofing," Mills used the singular term "plaintiff" because he was the sole plaintiff, albeit doing business as the construction and roofing company. More important, Mills filed the first amended petition in his own name only. As there is only one plaintiff, the court adequately identified the defrauded party by using the word "plaintiff."

The record does not reveal harm from the court's failure to make additional findings regarding the elements of damages. The court found that Mills was entitled to damages of $147,437. Flanary does not explain what specific findings are lacking. Even if appellant were entitled to more detailed findings, the record reveals that the court's failure to provide them has not impaired appellant's ability to appeal. The court plainly stated on the record that it awarded as damages the undistributed net profits described in Mills's exhibit 32, $155,947, reduced by $2500 as conceded by Coates, who had prepared the exhibit, and less an additional $6000 as explained by the court for the difference between an estimated, but unreported fee, and the actual fee reported at trial. Although exhibit 32 added $15,000 in unreimbursed investments and loans to the profits figure, the court stated on the record that its $147,437 award included the unreimbursed investments and loans.

12

These departures from exhibit 32 reduced Flanary's liability. The court's reference to exhibit 32, plus the evidence in the record, provides sufficient detail regarding the underlying facts to allow Flanary to appeal the damage award. We find no harm in the failure to make additional findings or conclusions.

**Error in finding fraud and breach of fiduciary duty**

Flanary contends that the court erred in finding that he breached a fiduciary duty and committed fraud against Mills. Flanary argues that he committed no acts as a shareholder for which Mills could recover. Alternatively, he contends that any breach or fraud was committed against the corporation and, as such, Mills could recover only his one-half share of the judgment.

Flanary's argument regarding the existence of a duty is legally accurate, but incomplete. He contends that he had no duty to Mills, his fellow shareholder. *See Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet. denied). While shareholders *generally* do not owe each other a fiduciary duty, they may in some circumstances, such as when a confidential relationship exists. *See id*. A confidential relationship exists where influence has been acquired and confidence has been justifiably reposed. *Id*. "A person is justified in placing confidence in the belief that another party will act in his or her best interest only where he or she is accustomed to being guided by the judgment or advice of the other party, and there exists a long association in a business relationship, as well as personal friendship." *Id*. Partners owe each other fiduciary duties as a matter of law. *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). We must therefore examine the record to discern whether a fiduciary relationship existed.

13

Because Flanary does not specify the level of scrutiny he wants applied to the record, we will review both the legal and factual sufficiency of the evidence supporting the judgment. In considering the legal sufficiency of the evidence, an appellate court considers only the evidence that supports the trial court's findings and disregards all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). If any probative evidence supports the factfinder's determination, it must be upheld. *See In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951). In reviewing factual sufficiency, we examine all the evidence and reverse only if the trial court's finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id*. In an appeal from a bench trial, findings of fact are the equivalent of jury answers to special issues. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991).

Ample evidence supports the finding that a fiduciary relationship existed. Flanary is Mills's uncle. Flanary is only six or seven years older than Mills; as they grew up, Flanary was more like a big brother than an uncle. Mills testified that he had always had faith in Flanary, looked up to him, and trusted him. Mills worked for Flanary in the oil fields in the 1980s. They were partners in a roofing business before they formed Easyliving Homes. Mills depended on Flanary to handle the finances of the roofing company and, later, Easyliving Homes. The evidence shows the requisite personal and professional relationships. Flanary told him not to worry about the profitability of the business. This evidence provides factually and legally sufficient evidence to show a confidential relationship.

The record also contains sufficient evidence that Flanary breached that fiduciary relationship. Mills and Flanary agreed to share the profits of the business equally (the most unequal

14

division alleged was the 51-49 split Flanary mentioned), and Mills entrusted Flanary with the finances of the company. Although the Flanarys testified that Mills was only part of the business for the first house, there was competing evidence from Mills, other builders, and some documents that Mills remained an equal shareholder for the corporation's four-year existence. Flanary spent thousands of dollars from Easyliving's account; some witnesses argued that these were business expenses, but other witnesses contended that these expenditures were for personal expenses that were not authorized. Although evidence showed that the company had an after-tax profit of more than $300,000, Flanary told Mills that the business was not profitable and wrote him a check for $7254.86, alleging that the amount was Mills's $15,000 investment, less expenses Mills owed. Legally and factually sufficient evidence supports the court's finding that Flanary violated the fiduciary duty arising from the confidential relationship he had with Mills.

This evidence also supports the finding of fraud. Breach of a fiduciary relationship can constitute fraud because the fiduciary relationship imputes higher duties, such as duties of good faith, candor, and "full disclosure respecting matters affecting the principal's interests and a general prohibition against the fiduciary's using the relationship to benefit his personal interest, except with the full knowledge and consent of the principal." *Chien v. Chen*, 759 S.W.2d 484, 495 (Tex. App.—Austin 1988, no pet.). At common law, the term "fraud" means an act, omission, or concealment in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another or the taking of an undue and unconscientious advantage. *Id.*; *Russell v. Industrial Transp. Co.*, 258 S.W. 462 (Tex. 1924); *Kellum v. Smith*, 18 Tex. 835 (1857). Common-law fraud includes both actual and constructive fraud. "Actual fraud" usually involves dishonesty of purpose

15

or intent to deceive. *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964). "Constructive fraud" encompasses those breaches that the law condemns as "fraudulent" merely because they tend to deceive others, violate confidences, or cause injury to public interests, regardless of the actor's mental state. *Id*. When one has a duty to speak the truth, a false representation of a past or present material fact is fraudulent when another relies thereon to his detriment. *See Chien*, 759 S.W.2d at 495. The evidence that showed the breach of fiduciary duty supports a finding of constructive fraud.

The record also supports a finding of actual fraud. There is evidence that Flanary deliberately deceived Mills. Flanary initially told Mills that the business was doing fine, but when Mills wanted to withdraw money from the company, Flanary told him it was losing money when it earned more than $300,000 in after-tax profits. Flanary altered the 1999 corporate tax return to delete references to Mills's ownership interest despite the original accountant's records showing Mills's investment persisting into 2000. A new accountant carried Mills's stock as Flanary's stock. Flanary's wife, at his direction, gave the accountant end-of-year summaries without supporting documentation to try to make the expenditure of corporate funds on personal expenses deductible. Flanary refused to let Mills examine the books before the lawsuit and refused during discovery to produce invoices and receipts documenting the personal expenses. Even accepting the Flanarys' version of events that they considered Mills no longer part of the corporation after his 1997 falling-out with their son, they never dissolved the corporation or returned his initial investment. The testimony showed that they never told Mills that he was no longer part of the corporation. Regardless of whether the ownership was 50-50 or 51-49, there is no indication in the record that the Flanarys could have excluded Mills without buying him out or voting him out. Nevertheless, the

16

record indicates that they used the corporate account as their own personal account. These actions, which are inconsistent with the agreement to share ownership, to defer distribution of profits, and to not seek reimbursement for out-of-pocket expenses, are evidence of fraud—particularly because the Flanarys' payment of personal expenses began early on in the company's existence. The court was forced to choose between Mills's evidence and Flanary's contentions that he had terminated Mills's interest in the corporation and did not try to conceal company records from Mills; the records from the district court do not provide a basis on which to reject the court's choice to credit Mills's evidence. In Mills's version of events, Flanary made promises he did not keep, and the inception and duration of his failure indicate he never intended to keep them; these broken promises cost Mills money.

Flanary alternatively contends that any fraud could only have been committed against the corporation. There is evidence that the promises, duties, and breaches arose before the company incorporated. Although the corporation may *also* have been injured, we conclude that there is evidence that the injury was personal as well. Further, Flanary's argument is that Mills is only entitled to half of the corporation's damages. As we discuss below, the district court only awarded Mills half of the undistributed profits. Flanary's alternative argument shows no error or harm.

There is legally and factually sufficient evidence of fraud.

**Evidence of damages**

Flanary contends that the evidence was insufficient to support the damage award because Mills's expert, Karen Coates, derived the amounts she used to calculate the damages from witness testimony, such as the testimony of other builders about their average profit on houses they

17

built. He contrasts that evidentiary support with his expert's testimony, which he contends was more compelling because it was based on the complete records of the corporation. Kleppe calculated that Mills's share of the profits was $22,204.44.

The record does not support Flanary's argument. The record reflects that Coates reviewed bank statements, deposit slips, checks and check stubs that were provided, the tax returns of the individuals and Easyliving, the company's general ledgers and financial statements, the articles of incorporation and related documentation, and depositions. The biggest difference between her testimony and Kleppe's is that she deemed the Flanarys' personal expenditures undistributed profits based on the agreement, asserted by Mills, that the corporation would not pay for personal expenses like cell phones and gasoline. There is no showing that Kleppe examined any documents casting a different light on these expenses, their characterization, or the existence of the agreement. The court faced a choice between two versions of the permissible uses of company funds and two experts' opinions based on those divergent versions. Factually and legally sufficient evidence support the court's damage award.

## CONCLUSION

Having resolved all issues in favor of the judgment, we affirm the judgment.

---

Mack Kidd, Justice

Before Chief Justice Law, Justices Kidd and Puryear

Affirmed

Filed:    September 30, 2004

18