**Affirmed and Majority and Dissenting Opinions filed August 28, 2018.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00248-CV

---

## IN THE MATTER OF THE GUARDIANSHIP OF MARK SCOTT CROFT

---

**On Appeal from the Probate Court No. 3**
**Harris County, Texas**
**Trial Court Cause No. 415,844**

---

## M A J O R I T Y   O P I N I O N

Mark Scott Croft appeals the trial court's dismissal of his application for restoration of capacity to manage his estate and challenges the sufficiency of the evidence supporting the trial court's findings. For the reasons below, we affirm.

### BACKGROUND

Croft suffered serious injuries in a May 2009 motor vehicle accident, including a traumatic brain injury and injury-induced amnesia that lasted for three days. A Florida court found him to be incapacitated and established a guardianship of his person and estate in 2012. The guardianship of Croft's estate was transferred

to Texas later that year.

The Florida court restored Croft's rights with respect to the guardianship of his person in February 2015. Croft filed an application in Texas that same month seeking restoration of his capacity to manage his estate.

When it receives an application for restoration of capacity, the trial court must sign an order that (1) grants the application in accordance with Texas Estates Code section 1202.155; or (2) dismisses the application in accordance with Texas Estates Code section 1202.157. *See* Tex. Est. Code Ann. §§ 1202.155, 1202.157 (Vernon 2014). The order must contain findings of fact and comply with the general requirements set out in section 1202.154. *See id*. §§ 1202.155, 1202.157; *see also* Act of June 17, 2011, 82nd Leg., R.S., ch. 823, § 1.02, 2011 Tex. Gen. Laws 1917, 2046 (amended 2015) (current version at Tex. Est. Code Ann. § 1202.154).[1]

The trial court held a hearing on Croft's restoration application in October 2015, at which the following evidence was admitted:

- A court-ordered evaluation of Croft completed by a neuropsychologist, Dr. Corwin Boake, in August 2015;

- a court-ordered evaluation of Croft completed by a psychiatrist, Dr. Priscilla Ray, in August 2015;

- testimony from Dr. Ray; and

- testimony from Croft.

---

[1] Certain provisions of the Texas Estates Code were amended in 2015. *See* Act of May 18, 2015, 84th Leg., R.S., ch. 214, §§ 16, 19, 20, 24, 25, 2015 Tex. Gen. Laws 1291, 1297-98, 1302. The amendments apply to guardianships created before, on, or after the September 1, 2015 effective date of the act, with specific identified exceptions that include, as relevant to this discussion, sections 1202.153 and 1202.154. *See id*.; *see also In re Guardianship of Tonner*, 513 S.W.3d 496, 499 n.2 (Tex. 2016) (per curiam). The excepted provisions apply only to an application or proceeding "for the restoration of a ward's capacity" filed on or after the effective date of the amendments; therefore, we cite to the prior version of those sections because Croft's application for restoration was filed in February 2015.

The trial court also indicated that it would consider a report of Croft's guardian ad litem, which previously had been filed with the court.[2]

The trial court dismissed Croft's restoration application in an order signed October 13, 2015. In its findings of fact, the trial court found that Croft was diagnosed in 2011 with bipolar disorder as a result of the traumatic brain injury he sustained in the accident. The trial court found that Croft "continues to suffer from decreased cognitive functioning and has problems with his memory and concentration." Finally, the trial court found that "Bipolar Disorder; decreased cognitive functioning; and impaired memory and concentration are mental conditions as the term is used in Texas Estates Code § 1202.155."

In its conclusions of law, the trial court determined that Croft was not eligible to be restored to full legal capacity because he suffers from multiple mental conditions. The trial court also concluded that there was a need to continue the guardianship of Croft's estate.

Croft challenged on appeal the trial court's dismissal of his restoration application and asserted that the trial court's order did not conform with statutory requirements. We sustained Croft's issue and concluded that the trial court's order on Croft's restoration application did not include the information required by sections 1202.154 and 1202.157. *See In re Guardianship of Croft*, 513 S.W.3d 592, 595-96 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also* Tex. Est. Code Ann. § 1202.157; Act of June 17, 2011, 82nd Leg., R.S., ch. 823, § 1.02, 2011 Tex. Gen. Laws 1917, 2046 (amended 2015). We remanded the case for further

---

[2] The guardian ad litem's report was filed with the trial court but was not admitted into evidence at the hearing. At the close of evidence, the trial court indicated that it would consider the report in reaching its decision and told the guardian ad litem "[w]e'll take your recommendation." The parties do not challenge the trial court's consideration of the report.

proceedings. *In re Guardianship of Croft*, 513 S.W.3d at 596.

The trial court signed an "Order on Ward's Application After Remand" on January 30, 2017, in which it dismissed Croft's application for restoration. The trial court's order contains additional findings of fact and conclusions of law. The trial court did not hear any additional evidence or testimony with respect to Croft's restoration application before signing the January 30, 2017 order. Croft timely appealed.

## STANDARD OF REVIEW

Croft does not assert that the second dismissal order fails to comply with statutory requirements. He does not contend the order is supported by no evidence. Instead, he challenges several of the trial court's findings of fact included in its January 30, 2017 order on grounds that these findings are not supported by factually sufficient evidence.

In a nonjury trial, findings of fact have the same force and dignity as a jury's verdict. When a complete reporter's record is filed, we review the trial court's findings of fact for evidentiary sufficiency under the same standards applied to jury verdicts. *Jones v. Smith*, 291 S.W.3d 549, 552 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "In doing so, we do not substitute our judgment for that of the factfinder, even if we would have reached a different conclusion when reviewing the evidence." *Green v. Alford*, 274 S.W.3d 5, 23 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). We are bound by any unchallenged factual finding unless the record is legally insufficient to support it. *Saulsberry v. Ross*, 485 S.W.3d 35, 41 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).

A party challenging the sufficiency of the evidence offered in a nonjury trial must challenge specific findings of fact. *Jones*, 291 S.W.3d at 552. A party

4

challenging the factual sufficiency of a finding on which that party bore the burden of proof must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Green*, 274 S.W.3d at 23 (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam)). We consider and weigh all the evidence in a neutral light and may set aside a challenged finding "only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id*. "The amount of evidence necessary to affirm a judgment is far less than the amount necessary to reverse it." *Thomas v. Uzoka*, 290 S.W.3d 437, 452 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). The factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id*.

The trial court is not required to make findings on every controverted fact, but only for "those having some legal significance to an ultimate issue in the case." *Stuckey Diamonds, Inc. v. Harris Cty. Appraisal Dist.*, 93 S.W.3d 212, 213 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *see also Flanary v. Mills*, 150 S.W.3d 785, 792 (Tex. App.—Austin 2004, pet. denied). "Additional findings and conclusions are not required if they are merely evidentiary, or aimed at tying down the court's reasoning rather than its conclusions." *Stuckey Diamonds, Inc.*, 93 S.W.3d at 213.

**ANALYSIS**

Croft challenges the factual sufficiency of the evidence to support six findings of fact included in the trial court's January 30, 2017 order. We examine the challenged findings against the backdrop of the governing statutory standards.

**I.      Statutory Scheme**

      **A.      Incapacity is a Threshold Determination**

Before ordering the settlement and closing of a guardianship, the trial court must find by a preponderance of the evidence "that the ward is no longer partially or fully incapacitated."  Act of June 17, 2011, 82nd Leg., R.S., ch. 823, § 1.02, 2011 Tex. Gen. Laws 1917, 2045-46 (amended 2015) (current version at Tex. Est. Code Ann. § 1202.153).  The Texas Estates Code defines an "incapacitated person" as "an adult who, because of a physical or mental condition, is substantially unable to: (A) provide food, clothing, or shelter for himself or herself; (B) care for the person's own physical health; or (C) manage the person's own financial affairs[.]"  Tex. Est. Code Ann. § 1002.017(2) (Vernon 2014).

If the trial court determines that the ward remains partially or fully incapacitated — in other words, that the ward remains substantially unable to perform at least one of the categories of activities listed above — then the court should dismiss the ward's restoration application.  *See id*.; Act of June 17, 2011, 82nd Leg., R.S., ch. 823, § 1.02, 2011 Tex. Gen. Laws 1917, 2045-46 (amended 2015).  Under section 1202.157, the dismissal order must contain findings of fact and specify that "the guardian's powers, limitations, or duties with respect to the ward's care or the management of the ward's property remain unchanged."  Tex. Est. Code Ann. § 1202.157.

**B.**     **Section 1202.155 Addresses Additional Factors to be Considered After the Threshold Incapacity Determination**

Section 1202.155 delineates the requirements for an order restoring a ward's capacity.  *Id*. § 1202.155.  The trial court looks to section 1202.155 only after it makes the threshold determination that the ward no longer is an incapacitated person. *See id*.; *see also In re Guardianship of Croft*, 513 S.W.3d at 595.

Once the trial court determines that the ward no longer is an incapacitated person, an order restoring the ward's capacity must find that "there is no further need

for a guardianship of the person or estate of the ward." Tex. Est. Code Ann. § 1202.155. If the ward's incapacity resulted from a mental condition, the order must find that "the ward's mental capacity is completely restored . . . ." *Id*.

If the ward's mental capacity is completely restored and there is no further need for a guardianship of the person or the estate, then the trial court should sign an order granting the restoration application and containing the findings of fact prescribed by section 1202.155. *In re Guardianship of Croft*, 513 S.W.3d at 595. Otherwise, the trial court should sign an order making findings and dismissing the application in accordance with section 1202.157. *Id*. Findings made in an order dismissing a restoration application "may encompass determinations made by the court with respect to eligibility for complete restoration of the ward's capacity." *Id*.

## II. Hearing on Croft's Restoration Application

Croft's application sought to restore his capacity with respect to management of his estate. The following evidence was presented at the hearing.

### A. Dr. Boake's Report

Dr. Boake's August 2015 report is based on a review of Croft's medical records and a May 2015 examination of Croft during which Croft completed neuropsychological tests.

Dr. Boake's report begins by summarizing the medical care Croft received after the 2009 motor vehicle accident. Croft underwent several neuropsychological evaluations from 2009 through 2014. A 2010 evaluation "revealed suicidal ideation" and a 2011 evaluation noted "severe emotional distress." Croft was hospitalized in December 2011 following an overdose and was "diagnosed with bipolar disorder secondary to head injury." Croft was hospitalized for depression in 2012.

Dr. Boake's report also summarizes medical records received from physicians

7

who treated Croft after the 2009 accident, including Dr. Cindy Ivanhoe. Dr. Ivanhoe evaluated Croft in June 2012 and determined that he "was incapable of driving, administering medication, and managing business or financial affairs." Dr. Ivanhoe's June 2012 evaluation concluded that Croft was partially incapacitated. Dr. Ivanhoe evaluated Croft again in February 2015 and concluded that he "had deficits in short-term memory, understanding and communicating, breaking down complex tasks into simple steps and carrying them out." Following this evaluation, Dr. Ivanhoe concluded that Croft was "capable of making decisions."

Describing Croft's functioning as of August 2015, Dr. Boake's report states that Croft lives in Florida with his sister and a teenage relative; administers his own medications; cooks independently; and bikes or walks to local stores. Describing his neuropsychological functioning, Croft told Dr. Boake: "I think I'm pretty much back to the way I was" except for difficulty "multitasking." As recounted in the portion of Dr. Boake's report entitled "Current Functioning," Croft also stated as follows:

> . . . he recently left his sister's home for several weeks and lived at a nearby marina. [Croft] said that during this period he did not receive any medications for about 6 to 8 weeks. [Croft] said the reason he left his sister's home was fear of placing a burden on her.

Dr. Boake's evaluation summarizes Croft's performance across various dimensions of neuropsychological functioning including vision; emotion; motor; speech-language; memory; and intelligence. With respect to Croft's emotional state, Dr. Boake's report notes that Croft "denied symptoms of depression except for mildly decreased pleasure. The current score on the Beck Depression Inventory-II is in the normal range and is dramatically improved from the previous scores." Dr. Boake's report states that "[i]t needs to be considered that given the purpose of the evaluation, Mr. Croft may have been motivated to create a positive impression." Croft tested

normally across the remaining dimensions included in Dr. Boake's report.

Dr. Boake's conclusions, in relevant part, state as follows:

Mr. Croft's current neuropsychological test results are in the normal range. The cognitive impairments noted at previous evaluations are not apparent. . . . The current results imply that Mr. Croft is able to comprehend information spoken to him, to express his thoughts, to recall a normal amount of new information, and to engage in decision-making based on this information.

*  *  *

A post-traumatic amnesia duration of about 3 days has been estimated by different neuropsychological evaluations. . . . [A] duration of post-traumatic amnesia of 3 days would not be expected to result in permanent mental incompetency.

## B. Dr. Ray's Report and Testimony

Dr. Ray's August 2015 report is based on a review of Croft's medical records; a May 2015 forensic psychiatric interview with Croft; the results of Dr. Boake's neuropsychological testing; an interview with the guardian of Croft's estate; and an interview with Croft's sister with whom he lives.

With respect to his living situation, Dr. Ray's report notes that Croft "attends to his own hygiene and grooming" and is "able to shop, cook, clean." The report states that Croft made his own travel arrangements for his trip to Houston to meet with Dr. Ray. The report also recounts the episode during which Croft temporarily ceased to live with his sister and states as follows: "He ended up homeless, sleeping at the marina, showering in a gym and eating at soup kitchens. He was without his medications for 6-8 weeks . . . ."

With respect to his symptoms, Dr. Ray's report notes that Croft has migraine headaches that sometimes are accompanied by vomiting. Croft also reported that he suffers from a "sleep disorder" because of the accident that causes him to go "days

without sleep — as many as 7 in a row, although the more usual is 5."

Croft acknowledged that "[a]fter the accident he had a change in personality" and that "[h]is short-term memory is 'not perfect.'" Dr. Ray's report states that Croft "had depression from 2009-2011 with increased irritability (threw coffee on his wife)[,] impulsive behavior (jumped out of the car when upset), [and] feelings of guilt." Croft asserted that the depression was caused by his divorce and his health after the accident. Dr. Ray's report notes that Croft "has been given a diagnosis of Bipolar disorder due to traumatic brain injury, although he currently reports mood stability and denies symptoms of a mood disorder."

Summarizing the neuropsychological tests performed by Dr. Boake, Dr. Ray's report states:

> Mr. Croft's current neuropsychological test results are in the normal range and do not have the cognitive impairments noted at previous evaluations. The current results imply that Mr. Croft is able to understand information spoken to him, express his thoughts, recall a normal amount of new information, and engage in decision-making based on this information.

Dr. Ray concluded that Croft "possesses the ability to manage his financial affairs. It is anticipated that his condition will, depending on treatment compliance and other psychosocial stressors, continue to improve." The report also states that Croft's "current ability to formulate, make and express decisions about his financial affairs is not noticeably affected by psychiatric illness or medications."

Dr. Ray's testimony at trial summarized the contents of her report and stated:

> My opinion about Mr. Croft is that he had a traumatic amnesia following a traumatic brain injury, and was — the amnesia lasted about three days. Usually that length of post[-]traumatic amnesia doesn't result in permanent brain damage, but it can be extensive and somewhat long lasting.

\*       \*       \*

> My ultimate conclusion currently was that [Croft] demonstrated the ability to manage his affairs, and demonstrated no significant deficits in that when I examined him.

Dr. Ray testified that it is not unusual for a person to resume managing his own affairs after a closed-head injury.

Dr. Ray also testified that Croft was taking medication for his bipolar disorder "primarily [to] address[] the depressive part." Dr. Ray agreed that bipolar disorder is one of the "major mental disorders," but concluded that the disorder had no significant effect on Croft's ability to manage his affairs.

## C.   Croft's Testimony

Discussing the treatment he received after his accident, Croft testified that he received inpatient care at two facilities; was taking medication as of the October 2015 hearing; and no longer received psychiatric or psychological counseling. Croft testified that his IQ had been reduced "pretty dramatically from 142 now down to about 100" and that he has difficultly multitasking.

Croft testified that he made his own travel arrangements for his trip from Florida to Houston for the hearing. Croft agreed that it would be in his best interest to terminate the guardianship of his estate. Croft testified that he "feel[s] very confident [he] can take care of [his] own affairs."

Croft estimated that his estate currently was valued at $1.9 million as of the date of the October 2015 hearing.

## D.   Report of Croft's Guardian Ad Litem

The guardian ad litem's report notes that Dr. Ray opined it was in Croft's best interest to have his capacity to manage his affairs restored and the guardianship of his estate discharged. The guardian ad litem concurs with Dr. Ray's conclusions.

11

**III.    Croft's Challenges to the Trial Court's Findings of Fact**

The trial court's January 30, 2017 order dismisses Croft's application for restoration.  Croft challenges on appeal the following findings of fact:

4)    [Croft] continues to be, and presently is, an incapacitated person as defined in the Texas Estates Code.

11)    At the hearing, evidence was presented which showed that [Croft] presently suffers from multiple physical and mental conditions, disorders, and challenges as a result of the traumatic brain injuries which has rendered his incapacity [sic], as admitted in [Croft's] own testimony during the hearing, that interferes with his ability to manage his financial affairs, including his substant[ial] $1.9 million financial estate.

14)    The testimony from Dr. Ray was that the length of [Croft's] post-traumatic amnesia "can be extensive and somewhat long[-]lasting."

21)    Dr. Ivanhoe evaluated [Croft] on 2/17/15 and concluded [Croft] "had deficits in short-term memory, understanding, and communication, breaking down complex tasks into simple steps and carrying them out."

24)    Dr. Boake noted that wards undergoing evaluation may try to present themselves in a favorable light.

29)    [Croft's] financial estate has grown from $1.4 million to $1.9 million as of the last accounting.

Croft asserts that these findings are "so against the great weight of the evidence as to be manifestly unjust[.]"  We now turn to an examination of the factual support for the challenged findings.

**A.    Findings of Fact Nos. 4 and 11**

We consider together Croft's challenges to Findings of Fact Nos. 4 and 11 because they are related and legally significant with respect to the ultimate issue in the case, *i.e.*, Croft's capacity. *See Stuckey Diamonds, Inc.*, 93 S.W.3d at 213.

12

Findings of Fact Nos. 4 and 11 address (1) a threshold determination with respect to Croft's capacity under sections 1002.017(2) and 1202.153; and (2) a secondary determination with respect to incapacity resulting from a mental condition under section 1202.155. *See* Tex. Est. Code Ann. §§ 1002.017(2), 1202.155; Act of June 17, 2011, 82nd Leg., R.S., ch. 823, § 1.02, 2011 Tex. Gen. Laws 1917, 2045-46 (amended 2015); *see also In re Guardianship of Croft*, 513 S.W.3d at 595.

Challenging these findings, Croft asserts that "each witness and the documentary evidence all conclude that [he] is no longer incapacitated." Croft points to the conclusions of Dr. Boake and Dr. Ray, as well as the guardian ad litem's report and Croft's testimony at the hearing:

- In his expert report, Dr. Boake notes that Croft denied symptoms of depression and that his "current score on the Beck Depressive Inventory-II is in the normal range and is dramatically improved from the previous scores." Dr. Boake concludes that "[t]he cognitive impairments noted at [Croft's] prior evaluations are not apparent. . . . The current results imply that Mr. Croft is able to comprehend information spoken to him, to express his thoughts, to recall a normal amount of new information, and to engage in decision-making based on that information."

- With respect to Croft's bipolar disorder diagnosis, Dr. Ray's report states that Croft "currently reports mood stability and denies symptoms of a mood disorder." The report notes that Croft's "neuropsychological test results are in the normal range and do not have the cognitive impairments noted at previous evaluations." Dr. Ray's report concludes that Croft "possesses the ability to manage his financial affairs."

- Dr. Ray testified that Croft "demonstrated the ability to manage his affairs, and demonstrated no significant deficits."

- Croft testified that he no longer receives psychiatric or psychological counseling, and that he made his own travel arrangements for his trip to Houston. Croft agreed that it would be in his best interest to close the guardianship of his estate and testified that he "feel[s] very confident [he] can take care of [his] own affairs."

- The guardian ad litem's report concurs with Dr. Ray's conclusion that it was in Croft's best interest to have his capacity to manage his affairs restored.

Based on our review of the record, the following evidence supports the trial court's Findings of Fact Nos. 4 and 11:

- As summarized in Dr. Boake's report, Croft experienced several episodes of emotional distress and was diagnosed with bipolar disorder secondary to head injury. Croft was hospitalized for an overdose and for depression.

- Dr. Boake's May 2015 examination elicited information that Croft "recently" left his sister's residence and lived at a nearby marina. During this time Croft stated he "did not receive any medications for about 6 to 8 weeks."

- Dr. Boake's expert report summarizes Croft's medical records received from Dr. Ivanhoe. Dr. Ivanhoe's June 2012 evaluation concluded that Croft was partially incapacitated; her February 2015 evaluation concluded that Croft "had deficits in short-term memory, understanding and communicating, breaking down complex tasks into simple steps and carrying them out."

- Dr. Ray's expert report states that Croft's ongoing symptoms include migraine headaches that are sometimes accompanied by vomiting and a "sleep disorder" that causes Croft to go five to seven days without sleep.

- Dr. Ray's report notes that Croft stated he "had a change in personality" after the accident and that his "short-term memory is 'not perfect.'"

- Dr. Ray's report states that Croft was diagnosed with bipolar disorder. Dr. Ray testified that bipolar disorder is one of the "major mental disorders."

- Croft testified that he continues to take medication to treat bipolar disorder.

- Croft testified that he has difficultly multitasking.

The trial court's Finding of Fact No. 4 states that "[Croft] continues to be, and presently is, an incapacitated person as defined in the Texas Estates Code." Finding

14

of Fact No. 11 states that "evidence was presented which showed that [Croft] presently suffers from multiple physical and mental conditions, disorders, and challenges as a result of the traumatic brain injuries which has rendered his incapacity [sic], as admitted in [Croft's] own testimony during the hearing, that interferes with his ability to manage his financial affairs, including his substant[ial] $1.9 million financial estate."

The evidence discussed above supports these findings of fact and a determination that Croft is an "incapacitated person" as defined by statute because he is "an adult who, because of a physical or mental condition, is substantially unable to: . . . manage [his] own financial affairs[.]" *See* Tex. Est. Code Ann. § 1002.017; Act of June 17, 2011, 82nd Leg., R.S., ch. 823, § 1.02, 2011 Tex. Gen. Laws 1917, 2045-46 (amended 2015).

This evidence indicates that Croft continues to experience significant consequences from injuries and conditions resulting from the 2009 motor vehicle accident including bipolar disorder; deficits in short-term memory, understanding, communicating, and multitasking; migraine headaches; a sleep disorder causing him to go without sleep for days at a time; and changes in his personality.

This evidence also indicates a significant degree of continuing instability in Croft's current functioning. Medication for bipolar disorder continues to be prescribed for Croft, but he failed to receive medication for 6 to 8 weeks when he left his sister's house where he had been living and lived instead at a marina. As recounted in Dr. Ray's report, these circumstances arose at a time when Croft "felt like a 'burden'" to his sister. Dr. Ray's report states that Croft "ended up homeless, sleeping at the marina, showering in a gym and eating at soup kitchens. He was without his medications for 6-8 weeks; finally he went to the judge in Florida who threatened to 'put someone in jail' if it weren't straightened out." This report

15

continues: "[Croft] says he at that time blamed the Guardian of his Estate but has come to realize that he didn't understand the influences and pressures on her."[3] Dr. Ray interviewed Croft's sister, who stated as follows: "He was never homeless and is not now. Now he gets up, exercises and takes care of himself. He did leave my house when he was so frustrated about not getting money and my having to pay for things but he has always had a home here." Dr. Boake described these circumstances in a more abbreviated fashion in a portion of his report entitled, "Current Functioning." After describing the episode during which Croft "recently left his sister's home for several weeks and lived at a nearby marina," Dr. Boake's report states as follows: "[Croft] said he is in conflict with the guardian of the estate about managing his expenses and legal affairs."

Taken as a whole, this evidence supports the trial court's determinations that Croft (1) is incapacitated; (2) continues to suffer from "multiple physical and mental conditions, disorders, and challenges as a result of the traumatic brain injuries" sustained in the accident; and (3) is unable to manage his financial affairs. *See* Tex. Est. Code Ann. §§ 1002.017(2), 1202.155; Act of June 17, 2011, 82nd Leg., R.S., ch. 823, § 1.02, 2011 Tex. Gen. Laws 1917, 2045-46 (amended 2015).

Weighing this evidence against the evidence Croft relies on to dispute the trial court's findings, we conclude that the supporting evidence is not so weak as to render the challenged findings "against the great weight and preponderance of the evidence." *See Green*, 274 S.W.3d at 23.

In making this determination, we must refrain from substituting our judgment for that of the factfinder even if our review of the evidence would have yielded a different conclusion. *See id.* The trial court was the sole judge of the witnesses'

---

[3] The guardian of Croft's estate is attorney Fatima Breland.

credibility and the weight to be given to their testimony. *Thomas*, 290 S.W.3d at 452. Moreover, the trial court was not bound by the expert witnesses' conclusions and could consider the variables and assumptions upon which the experts' conclusions were based. *See Olin Corp. v. Smith*, 990 S.W.2d 789, 797 (Tex. App.—Austin 1999, pet. denied); *see also Duke Realty Ltd. P'ship v. Harris Cty. Appraisal Dist.*, No. 14-15-00543-CV, 2016 WL 3574666, at *3 (Tex. App.—Houston [14th Dist.] June 30, 2016, no pet.) (mem. op.).

We overrule Croft's challenges to Findings of Fact Nos. 4 and 11.

## B.    Croft's Remaining Challenges

Croft also challenges the factual sufficiency of the evidence supporting Findings of Fact Nos. 14, 21, 24, and 29.

Findings of Fact Nos. 14, 21, and 24 reiterate statements made by Dr. Boake, Dr. Ray, and Dr. Ivanhoe with respect to Croft's post-accident symptoms and performance on the neuropsychological evaluation. Croft asserts that these findings were taken out of context and omit additional statements made by the doctors that further clarify the statements' meanings.

Because these findings are evidentiary, they illustrate the trial court's reasoning rather than its conclusions and are not necessary for the trial court's resolution of the ultimate issues in the case. *See Stuckey Diamonds, Inc.*, 93 S.W.3d at 213; *see also Flanary*, 150 S.W.3d at 792. Moreover, the findings repeat verbatim evidence presented to the trial court. We reject Croft's challenges to Findings of Fact Nos. 14, 21, and 24.

Finding of Fact No. 29 states that "[Croft's] financial estate has grown from $1.4 million to $1.9 million as of the last accounting." Croft asserts that there is no evidence to support this finding.

17

Like Findings of Fact Nos. 14, 21, and 24, Finding No. 29 addresses an evidentiary matter. *See Stuckey Diamonds, Inc.*, 93 S.W.3d at 213; *see also Flanary*, 150 S.W.3d at 792. Croft testified at the hearing that his estate currently is valued at $1.9 million. We reject Croft's challenge to Finding of Fact No. 29.

## CONCLUSION

We overrule Croft's factual sufficiency challenges and affirm the trial court's January 30, 2017 order dismissing Croft's application for restoration.


/s/     William J. Boyce
        Justice


Panel consists of Justices Boyce, Jamison, and Brown (Jamison, J., dissenting).