# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00617-CV

---

### C. C., Appellant

v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 313,975-B, THE HONORABLE JACK WALDEN JONES, JUDGE PRESIDING

---

### O P I N I O N

C.C.[1] appeals from a final decree terminating her parental rights to daughter "Della," aged 15 years when the associate judge rendered the decree, and naming the Department of Family and Protective Services as Della's sole managing conservator. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P), (2). The decree also terminated the rights of Della's father, who did not appeal. For the reasons set forth below, we will reverse the portion of the decree terminating Mother's parental rights and remand for new trial.

### I. BACKGROUND[2]

Della is a teenager with profound physical and intellectual disabilities caused by a chromosomal defect known as 1p36 deletion. As a result of her diagnosis, Della is non-verbal

---

[1] *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

[2] This section is taken from undisputed aspects of the record.

and cannot use sign language, has impaired vision with partial blindness in one eye, walks only with the assistance of leg braces; suffers from seizures, wears diapers, and prefers toys typically used by infants instead of age-appropriate activities.  She takes medication to control her seizures and requires regular occupational and physical therapy.  Della cannot attend to her own needs, relies on total care from her caregivers and, as the Department describes it, needs "constant supervision."  At the onset of this case, Della was living with C.C. and C.C.'s boyfriend, and Della's father was incarcerated in a federal penitentiary on an unspecified "sexually heinous crime"[3]; by the time of trial, Della was living at a non-profit facility known as the Hope House, which provides residential care for certain children and adults with disabilities.  Aside from her disabilities, Della is reportedly in generally good health, although at intake she did have an unclassified cyst on her head and nascent curvature of the spine.

According to its removal affidavit, the Department became involved with C.C. and Della in September of 2019 when it received an anonymous report expressing concern about C.C.'s well-being.  The caller indicated that C.C. was using methamphetamines and was "hardly ever" home, that Della was typically left alone with C.C.'s boyfriend, that C.C. occasionally "falls asleep while driving with [Della] in the car," and that C.C. was "going downhill and even lost her job."  The affidavit indicated that neither the caller nor the Department was aware of any "accidents or injuries to the child as a result of [C.C.'s] drug use" and that Della had not been involved in any automobile accidents.

---

[3]  This is the language used at intake.  Exhibits admitted at trial indicate that in 2015 Della's father was convicted of seven counts, including strangulation (2 counts), assault with a deadly weapon (1 count), assault with intent to commit murder (2 counts), and aggravated sexual assault (2 counts).  The acts giving rise to the charges and subsequent conviction occurred in 2013 and 2014.  The trial court sentenced Della's father to 240 months of imprisonment in the custody of the federal government.

Shortly after the anonymous report, a Department investigator met with C.C., who denied use of methamphetamines but said she might have accidentally taken "ecstasy laced with methamphetamines." When C.C. tested positive for methamphetamines and amphetamines,[4] the investigator returned to inform C.C. that she would need to submit to random drug testing, which C.C. agreed to. By November, C.C. had not followed through with her testing obligation, offering several excuses for missing her appointments while also admitting that she had been using methamphetamines since March and that she had recently taken ecstasy "45 days in a row" to "stay focused."

In December, the associate judge ordered C.C. to begin therapy and parenting classes, to submit to drug testing, and to cooperate with the Department and the associate judge. A Department caseworker first tried to visit C.C. in December, but C.C. was not home. In January of 2020, the Department scheduled a home visitation with C.C., but C.C. was over an hour late for the meeting. C.C. explained that she had recently begun driving for a ride-sharing service and had an opportunity to pick up several additional rides before returning home. In an apparent attempt to accommodate for missing the visitation, C.C. dialed home and asked to be placed on speakerphone so that she might talk with the Department's representatives. During that call, C.C. indicated that she uses methamphetamines when she is tired, that she most recently used it two and a half weeks ago, that she sometimes is under the influence while she is providing ride-sharing services, that she does not "geek out" when under the influence, that she is prone to depression but does not treat that depression, and that she had not complied with the

---

[4] Ecstasy is an amphetamine. *See Ex parte Ghahremani*, 332 S.W.3d 470, 476 (Tex. Crim. App. 2011) (referring to ecstasy as an amphetamine); *Richmond v. State*, No. 01-16-00380-CR, 2017 WL 929538, at *2 (Tex. App.—Houston [1st Dist.] Mar. 9, 2017, no pet.) (mem. op., not designated for publication) ("'3,4–methylenedioxy amphetamine' is more commonly known as ecstasy.").

order. C.C. eventually arrived at home for the end of the visitation and signed a family service plan that required C.C. to attend parenting classes and psychological therapy, submit to a substance-abuse assessment and regular drug testing, maintain employment and provide child support, demonstrate an ability to provide a safe home for Della and meet Della's special needs, and avoid drug use and criminal activity.

In the third week of January, the Department conducted an unannounced home visit after learning that C.C. had tested positive for methamphetamines and amphetamines the previous week. The Department's investigator found C.C. and Della in the home with C.C.'s boyfriend and Della's 19-year-old brother, Christopher. Christopher and C.C.'s boyfriend both denied any awareness of C.C.'s drug use, but Christopher conceded that he himself would likely test positive for THC if subjected to a drug test. While the investigator was on site, C.C. submitted to another test, , which came back positive for methamphetamines and amphetamines. C.C. agreed to a safety plan whereby her boyfriend would serve as Della's primary caregiver and C.C. would find somewhere else to stay. After the unannounced visit, the Department concluded that "[t]here is considerable concern for the safety and well[-]being of [Della] if left in this home and left with a caregiver who is actively using Methamphetamines." The associate judge entered temporary orders removing Della from the home, appointing the Department as temporary managing conservator, and requiring C.C. to comply with the provisions of the family service plan and the safety plan. The Department placed Della in a residential facility in San Antonio.

In March, the Department filed a status report indicating that C.C. was complying with most of her service plan but was still testing positive for methamphetamines. The report stated that both C.C. and Della were in good health and that Della was closely bonded to her mother. C.C. allegedly told the Department that she had moved back into the family home but

4

would be "unable" to remain there—apparently for financial reasons—and was actively looking for other housing options. The Department recommended that it remain managing conservator and that C.C. have monitored visitation; it also indicated concurrent goals of family reunification and adoptions.

At the end of March, the Department filed the results of C.C.'s initial psychological screening. The psychologist found C.C. to be of "average intelligence" but diagnosed C.C. with multiple substance-abuse disorders and post-traumatic stress disorder. He noted that she had begun taking two prescription medications for depression. He also observed:

> [C.C.] was dressed neatly and appropriately in a sweatshirt, jeans, and tennis shoes. Her black hair appeared neat and clean, and her grooming and hygiene were within normal limits. [C.C.] appeared anxious and somewhat sullen, though she was polite, forthcoming, and cooperative throughout the evaluation. She made appropriate eye contact, and rapport was easily established.
>
> . . . .
>
> She reported experiencing frequent nightmares, flashbacks, and exaggerated startle response stemming from past traumatic events. [C.C.] currently presents with sleep difficulties, mood instability, anxiety, appetite disturbance, and a sullen mood, though these symptoms may be attributable to separation from her daughter and perceived instability in her life. She also reported a history of alcohol and drug abuse.

The psychologist then recommended that C.C. remain enrolled in Narcotics Anonymous, continue seeing her therapist, and maintain a regimen of prescribed psychotropic medications. The psychologist made no comment on C.C.'s parenting abilities.

In April, C.C. filed a motion to modify the temporary orders. C.C. reported that Della's placement facility was not providing the care necessary to address Della's disabilities and was not following Della's specialized diet. In addition, C.C. reported that inadequate supervision by the facility and the Department had resulted in a broken ankle and that Della had

5

regressed from walking with assistance to full-time use of a wheelchair. According to C.C., Della was also suffering from bruises, a pervasive rash, and bed sores. C.C. asked to have Della transferred to the Hope House. The associate judge agreed.

In October, the Department filed its permanency report recommending continued placement and restating the goal of reunification or unrelated adoption. The associate judge adopted that recommendation through permanency orders. The following month, the Department filed an amended petition seeking reunification, if possible, and otherwise seeking termination of C.C.'s rights. In its final report to the associate judge, the Department recommended termination of C.C.'s parental rights "based on her lack of action or ability to demonstrate a desire of a sober life," which "would place [Della] in harm's way and/or at risk of future abuse/neglect if [Della] were to be returned to [C.C.'s] care."

## II. TRIAL

In mid-2021, over the course of four days spanning four months,[5] the parties tried the case to an associate judge remotely in accordance with the emergency orders in place at the time. *See* Tex. Fam. Code § 201.005(a) (allowing assignment to associate judge); *Thirty-Sixth Emergency Order Regarding COVID-19 State of Disaster*, No. 21-9026, 629 S.W.3d 897, 897 (Tex. Mar. 5, 2021) (order); *Thirty-Seventh Emergency Order Regarding COVID-19 State of Disaster*, No. 21-9050, 629 S.W.3d 186, 186 (Tex. May 26, 2021) (order); *Thirty-Eighth Emergency Order Regarding COVID-19 State of Disaster*, No. 21-9060, 629 S.W.3d 900, 900

---

[5] The unusual timeline of the case, which remained pending for nearly two years, is presumably a result of the ongoing pandemic. *Cf.* Tex. Fam. Code § 263.401(a) (requiring trials in such cases to commence on or before the first Monday following the anniversary of the first filing of temporary orders). The Department's motion for an extension, which the trial court granted, referred only to "extraordinary circumstances" that necessitated extending the statutory deadline from January 25, 2021, to July 24, 2021. *See id.* § (b).

6

(Tex. June 6, 2021) (order); *Thirty-Ninth Emergency Order Regarding COVID-19 State of Disaster*, No. 21-9078, 629 S.W.3d 213, 213 (Tex. July 21, 2021) (order). Department caseworker Jessica Jones and respondent C.C. were the only witnesses to testify. The Department offered—and the associate judge admitted—ten exhibits into evidence; neither C.C. nor the guardian ad litem tendered any evidence for admission.

### A. Jones

Jones testified as the only witness for the State and began by explaining that the Department originally removed Della from the home due to concerns about C.C.'s alleged use of methamphetamines. She further testified that she "[did]n't know" if C.C. was currently employed and that, to her knowledge, C.C. was homeless. Jones testified that C.C.'s most recent drug tests had been two months earlier, when she tested positive for methamphetamines both times. According to Jones, C.C. did not submit to the remaining drug tests required by the Department and the court's orders. Jones explained that C.C. had completed the requisite rehabilitation and parenting classes but that she had been discharged by two therapists for inconsistent attendance and for "not taking [therapy] seriously." She testified that C.C. had regularly attended her visitations with Della until she tested positive for methamphetamines and that visitation would not resume until C.C. began testing negative on a regular basis. Jones conceded that C.C. had continued to provide supplies for Della.

With respect to Della, Jones described Della's disabilities in general terms, explaining, "She is diagnosed with—I believe it's a—it's a chromosomal deletion that results in her having, like, intellectual disabilities, [and] seizures on occasion." She then testified that Della would need continuing care after reaching the age of majority.

Jones explained that the Department had originally hoped for reunification but had revised its recommendation to termination. When asked whether the recommendation is in Della's best interest, Jones replied:

> At this time [C.C.] has been offered several opportunities to work services and make the progress necessary to have Della returned to her care. Unfortunately, at this time, nearly a year and a half later, [C.C.] is still not drug testing for the Department, she is still denying a potential relapse as of May, and she doesn't have the safe, stable housing that the Department has been able to assess. As of July 5th[,] she had reported to me that she did not have housing and that she was bathing in river water that came through Belton.

Jones added that, upon termination, "The Department would hope to send out referrals for potential adoptive homes for [Della]" but conceded that "with [Della's] disabilities and the services that she needs that may be difficult." She explained that without termination, adoption would not be possible, and Della would "essentially remain in the Department's care and custody in a facility placement potentially indefinitely."

On cross-examination, Jones testified that she had "not been able to meet with" Della but that she had remained in contact with Della's caregivers at the Hope House. She recalled that the reports she had received from "all parties," including the caseworker previously assigned to the case, indicated that C.C. and Della have a "positive relationship" and a "strong bond." Nevertheless, she reiterated her belief that termination is in Della's best interest.

**B. C.C.**

C.C. testified as the only witness on her own behalf. She testified that her car had been repossessed and that "it's hard to get a job" without a vehicle. She added that she was "applying steadily for jobs every day, still trying to work with unemployment, get that going." C.C. also attributed her inconsistency in reporting for drug testing to a lack of adequate

8

transportation. She attributed the failed attempts at therapy to the fact that she had previously been seeing her own therapist that she "really liked" when the Department asked her to begin seeing a Department-approved therapist. C.C. explained that she did not "see eye-to-eye" with the Department-approved therapists.

Addressing her struggles with substance abuse, C.C. testified, "I have been working very hard for my sobriety, everything that's been going on already." She continued by explaining that she "had some very unfortunate luck, really, and it just has crippled me right at the moment." She then emphasized the strain of not having consistent employment or "a reliable ride [or] a reliable place to stay."

Counsel asked C.C. to describe the care Della requires. C.C. responded:

> For the care "care"? She definitely needs her . . . ankle braces, because that's part of the chromosome deficiency that she has. It causes the low muscle tone in her lower legs which causes her feet to curl and her knees to knock and then it causes the scoliosis of the spine. She desperately needs them, the AFOs. And the shoes I brought her are actually some ones I special order off line [sic] because they fit her braces in there, but she hasn't had those on since she broke her ankle [at the San Antonio facilitly] last year. But she definitely, definitely needs those. . . . And her weight is a big concern because of that low muscle tone in her lower legs.

When asked if she thought she could "fulfill" those needs, C.C. responded, "Of course." She explained, "It's been 13 years that her and I were never separated. Every day I—every day I was with her. I watched her have 57 seizures. I have been to every doctor, every specialist, everything with her." C.C. added that during the pendency of this case she had "brought [Della] clothes and shoes and hygiene [sic]" and "a bunch of pull-ups." She emphasized that "if [Della] needs anything else," she would provide it. Finally, C.C. agreed that she could continue to assist

9

"with making sure these things happen" provided that her rights are not terminated. She emphasized that she had, as she characterized it, "done it for all these years already."

On cross-examination, the Department asked C.C. if she recognized that her testimony regarding substance abuse and sobriety conflicted with the results of her most recent testing. C.C. said she recognized the discrepancy but was not sure what might explain it.

## C. Exhibits

The associate judge admitted into evidence petitioner's exhibits, including the removal affidavit, the final report regarding conservatorship, C.C.'s family service plan, C.C.'s psychological evaluations, and a record of all drug testing and results from January through September of 2020. Also admitted were several documents related to Della's father's case, which is not at issue on appeal. Neither C.C. nor the guardian ad litem tendered any exhibits for admission. In addition, the parties did not ask for the case file to be admitted into evidence. As a consequence, the associate judge could take notice of the existence of those pleadings and filings but could not evaluate the truth of any statements made in those pleadings and filings. *See Tschirhart v. Tschirhart*, 876 S.W.2d 507, 508–09 (Tex. App.—Austin 1994, no writ).

## D. Recommendations

At the conclusion of C.C.'s testimony and after the guardian ad litem declined to call any witnesses, both sides rested and the associate judge asked the guardian ad litem for her recommendation. She replied:

> Your Honor, this is probably the hardest case I've had since I've been a guardian ad litem. I'm not going to lie to you. I have been team mom since day one. I still—I totally get why the Department is asking what they're asking. I mean, I have pulled for mom, and you've told her to go hair test and she didn't go. She's—you know, she hasn't carried out orders from the Court, and I get all of

that. And if I thought for one minute that we could find a place for [Della] to be adopted, then I would jump on the termination train. . . . But I still at this point cannot—cannot recommend termination. I don't think [the Department] ha[s] anything for [Della]. I've been in contact with the facility and they are very positive about mom and [Della's] communication, and their bond is strong enough that the facility has commented on how strong it is and hopes that [Della] can go back to mom. So that being said, you know, everything is in mom's court at this point, but I just—I can't get on the termination train. I just can't do it. So I know the Court will find [it] in the best interest, but my recommendation is not termination.

When asked to clarify her recommendation, the guardian ad litem explained that if reunification is not possible, "I want [C.C.] to be able to visit with [Della] [because] I think [Della] is going to need that no matter what we all decide."

The Department responded by emphasizing that C.C. had been afforded "every opportunity to try something and she's homeless, refusing to admit she relapsed, and the only chance this child has is in adoption because this woman is never going to get her act together." The Department then recommended termination under predicates (D) (knowingly placing child in endangering conditions), (E) (knowingly engaging in endangering conduct or placing child with persons engaged in endangering conduct), and (O) (failure to comply with court orders).

Counsel for C.C. disagreed with the Department's recommendation, explaining:

We have a child that is very—is very unlikely that would be adopted by anybody, that has nobody else but the mother, that it's only bonded to the mother. And I believe if we're really thinking about the best interest of the child, even if the Department has the conservatorship, that the parental rights should not be terminated and should be under certain conditions. My client should be allowed to give that care and that—and that love that she's been giving for so many years and that nobody else at this point can do for this child. I would really request for this Court to be—to treat this as a special—a special case. It's unusual. And I would like to request that my client's parental rights are not terminated

11

She closed by asking that C.C. "be allowed to work with the Department so she can do something for the child that she so desperately wants" to do.

The attorney ad litem then offered his position on the case:

> I don't see that we're accomplishing anything at all for this child by terminating the parental rights. I don't think the Department has met their ground [sic] by clear and convincing evidence that it's in the child's best interest. Although there may be grounds for termination . . . I think that the chances of this child being able to be adopted are virtually zero.

He concluded by observing, "I just can't see that it's in the best interest to take away the parental rights of either of these parents and just leave this child a ward of the state when—you know, with no possibility of an adoption."

The associate judge then announced his decision from the bench, finding that the Department had satisfied its burden with respect to the statutory predicates and that termination is in Della's best interest. The judge indicated that he would issue a final decree allowing C.C. weekly monitored access to Della on the condition that C.C. "is drug testing clean consistently."

### E. Judgment

In its decree of termination, the associate judge found that C.C. had: (1) knowingly placed or knowingly allowed Della to remain in conditions or surroundings that endangered her physical or emotional well-being, (2) engaged in conduct or knowingly placed Della with persons who engaged in conduct that endangered Della's physical or emotional well-being, (3) failed to comply with the provisions of a court order specifically establishing the actions necessary for C.C. to obtain Della's return, and (4) used a controlled substance in a manner that endangered Della's health or well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P). The associate judge also found that termination is in Della's best interest. *See*

12

*id.* § (2).   He then issued a final decree terminating C.C.'s parental rights and naming the Department as Della's sole managing conservator.   The decree also ordered "that [C.C.] is allowed to have possession and access to the child" in the form of "supervised virtual or in person visits with the child to be supervised by the Department, if she drug test[s] consistently and negative."

C.C. requested de novo review before the district court, *see id.* § 201.015(a) (allowing de novo review), but that request was denied as untimely, *see id.* (allowing three days to request review).   She then perfected this appeal, challenging the termination but not the designation of the Department as Della's sole managing conservator.

### III. STANDARD OF REVIEW

A court may order termination of the parent-child relationship only "if clear and convincing evidence supports that a parent engaged in one or more of the [statutorily] enumerated grounds for termination and that termination is in the best interest of the child."   *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied).   "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection."   *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018).   Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights."   *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)).   They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution.   *See Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam.*

13

*& Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental[-]rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child, a court cannot involuntarily sever that relationship" in absence of "evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007 and *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a

14

reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

## IV. DISCUSSION

In her sole issue on appeal, C.C. raises two arguments: first, that the evidence is legally insufficient to support the best-interest finding with respect to termination; and second, that the evidence is factually insufficient to support that finding. We disagree with the first assertion but agree with the second. C.C. does not challenge the conservatorship determination.

### A. Best-Interest Standard

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). "And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor child without clear and convincing evidence, 'the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied)). "Moreover, termination is not warranted 'without the most solid and substantial reasons.'" *Id.* (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of her child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with her child whatsoever." *Id.* (citing *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.)).

15

In evaluating best interest, we consider the factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976), which include the child's wishes, the child's emotional and physical needs now and in the future, any emotional or physical danger to the child now and in the future, the parenting abilities of any parties seeking access to the child, programs available to help those parties, plans for the child, the stability of any proposed placement, any evidence that the parent-child relationship is improper, and any excuses for the parent's conduct. *See also A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). It is the burden of the party seeking termination to establish that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The set of factors is not exhaustive, and no single factor is dispositive of the issue. *See Holley*, 544 S.W.2d at 371–72; *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.).

When it comes to children with physical or intellectual disabilities, "The fact that a child has special needs does not automatically mean that termination of the parent-child relationship is in the best interest of the child." *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *36 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem op.) (citing *In re L.C.L.*, 599 S.W.3d 79, 88 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc)). Instead, the factfinder must view the existence of any special needs—like all relevant facts and circumstances—through the *Holley* lens. *In re C.H.*, 89 S.W.3d at 27; *In re K.N.J.*, 583 S.W.3d at 823. For example, the factfinder must weigh the parties' relative abilities to meet the child's needs and any programs available to help them do so. *M.A.A.*, 2021 WL 1134308, at *36. Thus, a child's special needs weighs in favor of termination to the extent the evidence suggests that "termination of [the] parental rights would improve the outlook" for the child's health. *Id.*; *see also In re J.E.M.M*, 532 S.W.3d 874, 887 (Tex. App.—Houston [14th Dist.]

2017, no pet.) (reversing termination after observing, inter alia, that Department had not presented any evidence that termination of parental rights to child with autism would serve best interest).

## B. Legal Sufficiency

When evaluating a legal-sufficiency challenge, we consider all the evidence weighing in favor of the disputed finding and any undisputed contrary evidence. *A.C.*, 560 S.W.3d at 630–631. With respect to Della's wishes, it is undisputed that Della is non-verbal and cannot express those wishes.[6] And although all reports indicate that Della is closely "bonded" to her mother, and while bonding is some evidence of a child's wishes, it is not alone determinative of the question. *See In re G.S.*, No. 14-14-00477-CV, 2014 WL 4699480, at *11 (Tex. App.—Houston [14th Dist.] Sept. 23, 2014, no pet.) (mem. op.) (explaining use of bonding as evidence of wishes of non-verbal children); *In re M.A.M.S.*, No. 02-13-00168-CV, 2013 WL 5658253, at *8 (Tex. App.—Fort Worth Oct. 17, 2013, pet. denied) (mem. op.) (terminating notwithstanding that "mother and her children loved each other and had a strong bond"); *E.F. v. Texas Dep't of Fam. & Protective Servs.*, No. 03–11–00325–CV, 2011 WL 6938496, at *3 (Tex. App.—Austin Dec. 30, 2011, no pet.) (mem. op.) (explaining that courts may "consider their bond" as some evidence of child's wishes).

---

[6] Appellant's Brief contends that the fact that Della had "reach[ed] an age[-]appropriate grade in school" implies that she must be able to express herself and therefore precludes any conclusion that "the child is not able to express her desires regarding where she wants to live or what kind of relationship she wants with her mother." The brief urges this Court "to assume she could but that no one asked her what her desires were." The brief offers no evidence in support of that assumption, nor have we found any. Moreover, federal law requires the school district to enroll Della in age-appropriate education. *See* Placements, 34 C.F.R. § 300.116(e) (2020).

17

With respect to Della's physical and emotional needs, her need for extensive care and oversight is well established by this record. Both C.C. and the Department appear to have some understanding of those needs. And while the Department's first placement resulted in inadequate supervision, a failure to follow Della's daily regimen, and ultimately led to reported injuries, the Department later placed Della in the Hope House, which both the Department and C.C. agree can meet Della's needs if an adoptive home or reunification is not possible.

Turning to any physical or emotional dangers posed, there is overwhelming evidence that C.C. has a long history of substance abuse and remains in denial as to the risks of drug use, apparently telling the Department that both methamphetamines and ecstasy give her "more energy," that she is not unduly influenced by their use, and that she is not a drug addict but rather is suffering a temporary relapse. While the Department reported that it was not aware of any harm that had befallen Della as a result of her mother's substance abuse, that abuse nevertheless serves as some evidence of endangerment because it "exposes the child to the possibility that the parent may be impaired or imprisoned." *D.H. v. Texas Dep't of Fam. & Protective Servs.*, -- S.W.3d ---, --- No. 03-21-00255-CV, 2021 WL 5098308, at *3 (Tex. App.—Austin Nov. 3, 2021, no pet.) (citing *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009)). And given the number of times C.C. missed home visitations, therapy appointments, and drug tests, it stands to reason that her unpredictability may extend to any contact C.C. would maintain with Della if she were allowed to retain her parental rights. *Cf. J.E.M.M.*, 532 S.W.3d at 890 (recognizing need for stability and predictability as "paramount" consideration but finding little or no risk under circumstances of case).

With respect to parenting ability, the record reflects that C.C. has a history with the Department dating back to at least 2006, when someone reported that several children had

been left outside alone for over an hour. The present investigators researched but were unable to determine the outcome of that case. In 2010, the Department received a report that C.C.'s five children, including Della, were suffering neglect due to C.C.'s substance abuse and that the children were left unsupervised while playing in dangerous conditions. The Department investigated and removed the children. Two of those children were adopted; the three older children were assigned managing conservators until the Department deemed it safe for those children to return to C.C.'s care. In the present case, there is evidence that C.C. is often under the influence of illegal substances and is rarely home. There is additional evidence that C.C. is only employed intermittently and cannot maintain a stable household.

Turning to programs available to help C.C., the record reflects that C.C. attended the parenting classes required by the Department. However, the record also reflects that C.C. missed most of her drug tests during the pendency of this case, attended Narcotics Anonymous only occasionally, and abandoned psychiatric therapy notwithstanding her conceded struggles with mental health and substance abuse. On the whole, C.C. the evidence establishes that is not taking advantage of the support systems available to her.

With respect to plans for Della and the stability of those proposed plans, Jones testified that the Department plans to find an adoptive home for Della. Because the Department has not yet identified a prospective adoptive home, it is difficult to evaluate its plan with any specificity. *See J.E.M.M*, 532 S.W.3d at 887 (noting, inter alia, Department's failure to identify prospective adoptive home before reversing termination). C.C. plans for Della to remain a long-term patient at the Hope House and plans to continue to monitor her care into adulthood. She would like to eventually reunite with Della, although she does not know when or if that will be possible.

19

Turning to any evidence of an improper parent-child relationship, the record reflects that C.C. has struggled to parent effectively for years. *See, e.g.*, *In re S.A.*, No. 04-17-00571-CV, 2018 WL 521626, at *6 (Tex. App.—San Antonio Jan. 24, 2018, no pet.) (mem. op.) (listing prior Department involvement as evidence of improper relationship); *In re M.L.C.*, No. 04-17-00459-CV, 2017 WL 6597828, at *8 (Tex. App.—Austin Dec. 27, 2017, pet. denied) (mem. op.) (same). In addition, the Department's exhibits include evidence that at intake C.C. was rarely home, would leave the home to use methamphetamines, and had not served as Della's primary caregiver in some time. *See Latham v. Texas Dep't of Fam. & Protective Servs.*, 177 S.W.3d 341, 349 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding recidivist drug use to constitute evidence of improper parent-child relationship).

Finally, *Holley* requires that we consider any excuses for C.C.'s acts and omissions. No one disputes that C.C. suffers from depressive and anxiety disorders that leave her "tearful" and "nervous." Her psychology assessment revealed "overt physical signs of tension and stress, such as sweaty palms, trembling hands, complaints of irregular heartbeats, and shortness of breath." And while compromised mental health may serve as an excuse for certain acts or omissions, *see C.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00890-CV, 2018 WL 2709208, at *5 (Tex. App.—Austin June 6, 2018, no pet.) (mem. op.), the testimony and exhibits presented to the associate judge reflect that C.C. has made—at best—inconsistent efforts to address her mental health, a fact that tends to negate those health issues as any excuse for her conduct, *see id*. *See also A.J.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00661-CV, 2020 WL 1174189, at *10 (Tex. App.—Austin Mar. 12, 2020, no pet.) (mem. op.) (rejecting compromised mental health as an excuse where parent was not "seeking help" and issues remained "undertreated"); *In re T.C.*, No. 10-10-00207-CV,

2010 WL 4983512, at *7 (Tex. App.—Waco Dec. 1, 2010, pet. denied) (mem. op.) (rejecting diagnosis as excuse where parent "did not acknowledge or deal with" health problems); *A.B.*, 269 S.W.3d at 129 (rejecting diagnosis as excuse where parent "refused" any treatment).  For her part, C.C. blames her recent conduct on "very unfortunate luck" that has left her "crippled."  Yet we are aware of no authority indicating that a general appeal to misfortune will excuse choices like the ones that C.C. has made here.

Taken together and viewed in light most favorable to the termination decree, the evidence supporting the Department's position and the undisputed controverting evidence would allow a reasonable factfinder to form a sufficiently firm belief or conviction that termination of C.C.'s parental rights is in Della's best interest and therefore provide legally sufficient support for the finding to that effect.

### C.  Factual Sufficiency

In evaluating C.C.'s factual-sufficiency challenge, we must consider the evidence outlined in the previous section along with the remainder of the evidence.  *See In re A.B.*, 437 S.W.3d 498, 506 (Tex. 2014).  We must do so in a neutral light, s*ee id*. at 506 n.8, keeping in mind that C.C. challenges only the termination of her parental rights—not the designation of the Department as sole managing conservator.  With that in mind, and under the relatively unusual circumstances of this case, we cannot say the evidence presented is factually sufficient to support termination.

To begin with, C.C.'s testimony suggests that she is the only one with a thorough understanding of Della's diagnosis, the resulting disabilities, and the care Della requires.  When asked about Della's needs, and in sharp contrast to C.C.'s testimony, Jones revealed little or no

21

familiarity with Della's diagnoses or their effects on daily life: "She is diagnosed with—I believe it's an—it's a chromosomal deletion that results in her having, like, intellectual disabilities, seizures on occasion." She offered nothing more on the subject other than that she believed Della would require care well into adulthood. C.C., meanwhile, explained in detail exactly how Della's diagnosis affects everyday life. She testified about the seizures, the specialists, the durable medical equipment, the scoliosis, the low muscle tone, the difficulty walking, and the need for a modified diet. C.C. further testified that she had "been to every doctor, every specialist, everything with [Della]." C.C. testified that she "would really like to still see [Della]," that she would cooperate with the Department and the placement "in any way" she could, that she would like to "watch over [Della]," and that she could "make sure" Della's special needs are met.[7] By contrast, Jones admitted that she had never even met Della.

Second, while the Department produced no evidence that Della had ever sustained physical injury or harm from C.C.'s acts or omissions, it is undisputed that Della sustained significant injury shortly after the Department gained sole managing conservatorship. The Department's exhibits indicate that Della suffered a broken ankle following placement in her first facility; that she required specialized orthopedic care to facilitate rehabilitation; and that Della was struggling to "resume walking" almost a year later, even with physical therapy at school and the assistance of staff from her new placement at the Hope House. And it was C.C.—not the Department or the guardian ad litem—that filed a motion to modify the temporary orders that ultimately allowed Della to be transferred to the Hope House due to the injury. In addition, C.C. testified that Della had gained weight since removal and that the weight gain was impeding

---

[7] For this reason, the decree's provisions allowing conditional visitation with the child is not a substitute for the retention of C.C.'s parental rights, even in the context of the agreed appointment of the Department as managing conservator.

Della's mobility due to muscular weakness caused by the chromosomal defect. Thus, with respect to Della's special needs, the record reflects that Della's health is better served by maintaining C.C.'s rights to her daughter. *See M.A.A.*, 2021 WL 1134308, at*36. ("Wholly lacking from the record is evidence that termination of father's parental rights would improve the outlook for M.A.A.'s needs.").

Third, we cannot overlook the fact that the guardian ad litem disagreed with the Department's recommendation of termination. *See* Tex. Fam. Code § 107.001(f) ("If the guardian ad litem is not called as a witness, the court shall permit the guardian ad litem to testify in the narrative."); *In re C.R.*, No. 07-19-00009-CV, 2019 WL 1648265, at *2, 8 (Tex. App.—Amarillo Apr. 16, 2019, pet. denied) (mem. op.) (considering recommendation regarding best-interest analysis even where recommendation was not entered into evidence); *In re Croft*, 560 S.W.3d 379, 382 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (same); *In re O.N.H.*, 401 S.W.3d 681, 688 (Tex. App.—San Antonio 2013, no pet.) (same); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (same). *But see In re A.A.E.*, No. 05-18-00210-CV, 2019 WL 1552450, at *4 (Tex. App.—Dallas Apr. 10, 2019, no pet.) (mem. op.) (refusing to consider recommendation not entered into evidence). In her recommendation, the guardian ad litem told the associate judge that the placement facility had a good relationship with C.C., that Della and C.C. have a "strong bond," that she "want[s] mom to be able to visit with [Della]," and that she did not believe the Department had "a place for [Della] to be adopted."

Fourth, we note that—given the conservatorship proposed as an alternative to termination—the Department's arguments for termination are not availing. Nearly all of the Department's arguments at trial were predicated on an assumption that Della would be at risk of

harm if returned to C.C.'s care. While testifying, Jones pointed to evidence that C.C. remained in "relapse" and that she does not have "safe, stable housing." But C.C.'s substance abuse and unstable housing become less relevant if the Department is named sole managing conservator. *See M.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00531-CV, 2021 WL 1704258, at *1 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.) (in case involving parent's undisputed history of drug use and evidence of ongoing "pattern" of substance abuse, reversing termination of parent's rights but upholding appointment of Department as permanent managing conservator). And Jones conceded that Della is closely bonded to C.C., that C.C. had attended visitations when permitted, and that C.C. regularly sent supplies for Della. Indeed, the primary argument offered in favor of termination—as opposed to conservatorship alone—is that it might be easier for the Department to find an adoptive home for Della if C.C.'s rights are terminated immediately. But the Department's burden is not to prove what is most convenient for the Department—it is to demonstrate what arrangement best serves Della's interest. *See Holley*, 544 S.W.2d at 371–72. Moreover, as of the date of trial, and notwithstanding the long pendency of the case, the Department had identified no prospective adoptive homes for Della. In fact, Jones did not deny that it might be difficult to find such a home and that she could "not say what exactly the chances would be."

And finally, on this record, we conclude the decree's provisions allowing C.C. continued visitation are not consistent with the finding that termination is in C.C.'s best interest. The termination decree requires "that [C.C.] have supervised virtual or in[-]person visits with [Della] to be supervised by the Department, if she drug test[s] consistently and is negative." Yet the governing statutory scheme expressly addresses the scope of post-termination visitation, providing that a court may permit such visitation if the Department agrees and where "the

24

biological parent . . . filed an affidavit of voluntary relinquishment of parental rights under Section 161.103." *See* Tex. Fam. Code § 161.2061. Neither is the case here. Moreover, when announcing this provision from the bench, the associate judge said to C.C., "I'm not doing this for you; I'm doing it for the child," an apparent concession that termination—as it is defined in Texas—is not in Della's best interest. *See In re D.L.W.W.*, 617 S.W.3d at 81 (referring to termination as the severance of "any relationship . . . whatsoever").

To summarize, given the less-restrictive alternative of the Department's sole managing conservatorship, there is insufficient evidence to support the finding that termination is in Della's best interest. Therefore, cognizant of the constitutional concerns related to parental termination, the clear instructions from the Supreme Court of Texas that we strictly scrutinize termination proceedings, the strong presumption that preservation of the parent-child relationship is in Della's best interest, and our obligation to consider all evidence equally, *see L.C.L.*, 599 S.W.3d at 89; *In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *8 (Tex. App.— Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.), we conclude that a reasonable factfinder could not have formed a firm belief or conviction that termination of C.C.'s parental rights is in the Della's best interest. Accordingly, because the Department did not meet its burden at trial, we sustain C.C.'s factual-sufficiency challenge.

## V. CONCLUSION

We reverse the decree's provisions terminating C.C's parental rights and remand for a new trial on the question of termination. Because they are not challenged on appeal, we do not reach the provisions appointing the Department as Della's sole managing conservator or the provisions terminating the parental rights of Della's father. *See* Tex. Fam. Code § 263.404

25

(outlining findings necessary to support appointment of non-parent managing conservator in absence of termination of parent's rights); *In re J.A.J.*, 243 S.W.3d 611, 615 (Tex. 2007) (holding that challenge to conservatorship "was not subsumed in her challenge of the termination decision" where parent "did not specifically appeal" the conservatorship or related findings). We instruct the trial court to commence the trial no later than 180 days after our mandate issues. *See* Tex. R. App. P. 28.4(c).

_____

Edward Smith, Justice

Before Justices Baker, Kelly, and Smith
  Concurring and Dissenting Opinion by Justice Baker

Affirmed in Part; Reversed and Remanded in Part

Filed:  May 20, 2022